# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### April 28, 2015 Session

## STATE OF TENNESSEE v. DANNY BRANAM

**Direct Appeal from the Criminal Court for Knox County**
No. 96976      Mary Beth Leibowitz, Judge

_____

**No. E2014-01345-CCA-R3-CD – Filed July 31, 2015**

_____

A Knox County jury convicted the Defendant, Danny Branam, of felony murder committed during the perpetration of aggravated child abuse and aggravated child abuse. The trial court sentenced the Defendant to life in prison for the felony murder conviction with a consecutive twenty-year sentence for the aggravated child abuse conviction. On appeal, the Defendant contends that the trial court erred when it denied his motion for a mistrial and that the evidence is insufficient to sustain his convictions. After a thorough review of the record and applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and TIMOTHY L. EASTER, JJ., joined.

Mike Whalen, Knoxville, Tennessee, for the appellant, Danny Branam.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Senior Counsel; Charme P. Allen, District Attorney General; Joan S. Stewart and Christopher M. Rodgers, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Facts

This case arises from the death of the victim, B.S., a nineteen-month-old child.[1] The Defendant was in a relationship with the victim's mother and living with them at the time of the victim's death. For his involvement in the victim's death, a Knox County

---

[1] It is the policy of this Court to refer to minor victims by their initials.

grand jury indicted the Defendant for one count of felony murder committed during the perpetration of aggravated child abuse and one count of aggravated child abuse.

## A. Trial

The parties presented the following evidence at trial: Leslie Wakefield testified that she was working as a security officer at Big Oaks Apartments on Tuesday, April 5, 2011. She stated that around 7:00 p.m. that night, a tenant, Brittany Stinnett, approached her with the "lifeless body" of B.S. in her arms and asked for help because B.S. was not breathing. Ms. Wakefield told Ms. Stinnett to take B.S. back inside, and she followed her into Ms. Stinnett's apartment. Once inside, Ms. Wakefield noticed that B.S. was "covered with bruises" on her head, torso, arms, and legs. Ms. Wakefield asked what had happened to the baby, and Ms. Stinnett responded that she had fallen out of her crib. Ms. Wakefield left the apartment and called 911 to send investigators to the scene, because the situation was a "possible child abuse." When the ambulance arrived, Ms. Wakefield led the medical technicians to the apartment and stayed on the scene while it was being processed by the Knoxville Police Department. Ms. Wakefield testified that she did not see the Defendant anywhere on the scene.

Captain Dean Fontaine testified that he was a Knoxville firefighter who responded to the scene at 7:00 p.m. on April 5, 2011. Captain Fontaine entered the apartment and found B.S. on the couch in a diaper and in "obvious respiratory distress." She was "only breathing about eight times a minute," about a third of what a child should have been breathing. He noticed that B.S. had "quite a bit of bruising" on her left forehead, left jaw, both knees, and on her face above her mouth. He testified that she also had "numerous small bruises" all over her face and body. Captain Fontaine attempted to put an oral airway inside B.S.'s mouth, but her "jaws were clenched" preventing insertion. He testified that B.S.'s pupils were fixed and dilated, the "classic signs of a closed head injury." "Judging by the bruising and the overall scene," Captain Fontaine "determined this was probably a case of child abuse."

The ambulance arrived to transport B.S. to the hospital, and Captain Fontaine rode in the ambulance and performed several techniques to help B.S. breathe. He could not locate a site on her body to insert an IV because all of her limbs were bruised.

James Perry, a paramedic, testified that when he arrived at the apartment on April 5, 2011, he found B.S. lying on the couch surrounded by firefighters. The first thing he noticed was bruising on B.S.'s legs, and he noticed she was not breathing very well. He was told that she fell out of her crib, and he went to look at the crib. Mr. Perry noticed that the crib was broken, but he did not think the crib looked high enough off the ground to cause the injuries he had seen on B.S.

2

Dr. Carlos Angel testified that he was a pediatric surgeon at East Tennessee Children's Hospital and the University of Tennessee Hospital. He was present in the emergency room when B.S. was brought to the hospital, and he stated that the first thing he noticed was her bruises. B.S. was placed on a ventilator. The neurosurgery department was called to examine for possible head injuries. Dr. Angel testified that B.S.'s injuries were not consistent with an accident or fall. He explained:

> If a child falls from a height . . . he [or she] might have a loss of consciousness. [He or she] might have a closed head injury. That's all possible. But there's no reason for a child to have multiple bruises and bruises . . . [of] different ages. . . . And then you see that this child had bruises in different stages of resolution. So it looks like this child might have been traumatized multiple times.

On cross-examination, Dr. Angel agreed that B.S.'s injuries could have "theoretically" been accidental. He stated that he was not aware if she had a habit of climbing on things. He stated that, based upon his examination of B.S.'s injuries, he suspected abuse, which was why he called Child Protective Services.

Officer Danielle Wieberg testified that she was an evidence technician with the Knoxville Police Department and that she responded to a request to photograph the injuries of a child at the University of Tennessee Hospital on Tuesday, April 5, 2011. Officer Weiberg arrived at the hospital and began photographing B.S.'s injuries, which she described as bruises "all over" B.S.'s body. Officer Wieberg said that B.S. was not conscious when she photographed her body. Those photographs were admitted into evidence. From the hospital, Officer Wieberg went to the apartment where the victim was living. She took photographs of the entire apartment, including the crib where B.S. slept. Those photographs were also admitted into evidence. From the photographs, Officer Wieberg noted that a "red blood like substance type stain" was found on B.S.'s pillow in her crib and a bamboo stick was found on the floor of B.S.'s room. Officer Wieberg noted that B.S.'s room had carpeted floor, and she photographed the thickness of the carpet and underlying pad by pulling both up from the floor.

Officer Wieberg identified items found at the apartment: two Kroger receipts from April 4, 2011, and a Walmart receipt, Dollar General Store receipt, and a Western Union receipt, all dated April 5, 2011. Also collected from the apartment was the victim's crib, crib mattress, and bedding. Officer Wieberg recalled that two hours elapsed between the time that she received the call to the hospital and when she arrived at the apartment.

Dr. Mary Palmer, a pediatric emergency medicine physician, testified as an expert in the fields of pediatric emergency room medicine and pediatric child abuse. Dr. Palmer

3

arrived at the hospital the day after B.S.'s admission, and she examined her. Dr. Palmer also reviewed B.S.'s hospital records on that day, which were admitted into evidence.

Dr. Palmer testified that B.S.'s emergency room records stated that she was unresponsive when EMS personnel found her. The history contained in the records stated that B.S. had suffered a six-foot fall and that the parents had reported that she jumped out of her crib. Dr. Palmer noted that the records included documentation of the injuries and bruises on B.S.'s body. After examining B.S.'s body, Dr. Palmer wrote her own consultation report, which she read aloud for the jury:

> [Nineteen] month old [victim] with (1) extensive bruising focused on head (both sides) and back and buttocks and thighs and knees. (2) [Three] areas of unusual patterned abrasions on right lower abdomen and bilateral medial thighs. (3) Intracranial bleeding and swelling consistent with significant closed head injury, and (4) Retinal hemorrhages per ICU M.D., to be confirmed by ophthalmology consistent with shaking injury.

> Skeletal survey for boney injury held now for blood pressure instability, none underlined of the injuries above are consistent with any accidental mechanism of injury, but rather are a pattern of repeated blows with great force, and in some places abrasions consistent with pinching or dragging on the skin.

> The injuries are life threatening with certainty of impairment if the child survives. And the pain inflicted was severe. Will follow.

Dr. Palmer identified photographs of B.S.'s body, which depicted the injuries and abrasions on B.S.'s face and head. She stated that the multiple distinct areas of injury made it impossible that they were caused by one fall. Dr. Palmer testified that the bruising on the side of B.S.'s head was consistent with a blow to the head. She stated that some of the injuries to B.S.'s head were more than a day old, and she recalled that it was the opinion of the other emergency room physicians that B.S.'s injuries were at different stages of healing.

Dr. Palmer identified photographs of injuries to B.S.'s torso. The injuries "gave the impression of the skin being pinched with an instrument or with a hand . . . , or possibly if a belt was used . . . ." Dr. Palmer stated that she concluded that the injuries were not accidental. She also identified injuries to B.S.'s legs and bottom, which she said were not consistent with accidental falls. Dr. Palmer identified a "healed burn" on B.S.'s right leg, which she described as non-accidental.

4

Dr. Palmer testified that B.S.'s intracranial injury was "substantial and significant" and not consistent with her falling on any surface. She stated that "there's no accidental mechanism that I can conceive of or that has been presented . . . that would explain [B.S.'s injuries] even in some minority much less the totality." Dr. Palmer further stated:

> [B.S.'s] injuries were so substantial even in the skin findings as to lead to concern for abuse, but then in addition the CT scans and her medical course leading to her death were consistent with severe shaking and impact injury to the head that's just not consistent with an accidental mechanism.

On cross-examination, Dr. Palmer agreed that she spoke to the police about B.S.'s case and relied on their information regarding what proposed injury mechanisms caused B.S's injuries. She agreed that she did not speak with B.S.'s family about what had happened or about B.S.'s behavior and temperament. Dr. Palmer stated that the only information she was given about B.S. was that she jumped out of her crib multiple times.

About B.S.'s injuries, Dr. Palmer agreed that the pinch marks on her skin could have been caused by a broken piece of B.S.'s crib, which was shown to her. She agreed that she did not examine the crib or any of the toys in the room and therefore could not determine whether they could have caused B.S.'s injuries, however she restated that B.S.'s extensive injuries could not have been sustained from falling on those items. She explained: "The bruises on [B.S.'s] body were over every body surface. In areas not normally impacted by children when they fall. In a number [of areas] that we couldn't even count, in such a way that in many times they ran together[.]" She agreed that children die from injuries caused by toys or falling out of cribs. She also agreed that if B.S. was falling off furniture regularly and "running crazy," that would explain her multiple bruises of varying ages.

On redirect-examination, Dr. Palmer testified that she "could not conceive of a force" that would have caused B.S.'s injuries to her head within the confines of the bedroom where the crib was.

On recross-examination, Dr. Palmer agreed that she had not determined who of the people living with B.S. had inflicted the injuries on her body.

Brittany Stinnett, the victim's mother, testified that she lived in an apartment with the Defendant, the victim, her second child, "Phoenix," and Michael Stinnett. Mr. Stinnett slept on the couch, and she, the Defendant, and Phoenix slept in a room together. B.S. had her own room but sometimes slept in the room with Ms. Stinnett and the Defendant. On Sunday, April 3, Ms. Stinnett took B.S. and Phoenix to church with Ms. Stinnett's mother. Photographs were taken of the family at church, and Ms. Stinnett identified them. Ms. Stinnett recalled that, after they returned home that day from

church, she remembered the Defendant took B.S. into her bedroom. She stated that B.S. spent most of the time in her bedroom. This was because the Defendant told Ms. Stinnett that she and B.S. had too strong of a bond and that B.S. would cry all the time when the Defendant took care of her. She did not believe that she had too strong of a bond with B.S. Ms. Stinnett denied being scared of the Defendant, stating that she was in love with him.

Ms. Stinnett testified that the Defendant would threaten to leave her, and she would cry and beg him not to leave. Because of this threat, Ms. Stinnett allowed him to put B.S. in the bedroom. She stated that "this" "happened all the time" and that B.S. spent most of her time in her bedroom. Ms. Stinnett recalled that she was starting a new job on Monday, April 4, 2011, and woke up at 4:00 a.m. that morning. When she woke up, she found the Defendant sitting at a computer with B.S. sitting next to him in a chair. She did not notice anything odd about B.S.'s demeanor. Ms. Stinnett recalled that she left for work before 7:00 a.m. and that the Defendant was the only person awake. She returned home around 7:45 p.m. that evening, at which time the Defendant put B.S. to bed, and the couple went grocery shopping. Ms. Stinnett testified that the Defendant put B.S. to bed most of time. She stated that, when she kissed B.S. before she went to bed, Ms. Stinnett observed bruising on B.S.'s head.

Ms. Stinnett stated that Mr. Stinnett stayed at the apartment with B.S. while she, the Defendant, and Phoenix went grocery shopping. When they returned from the grocery store, Ms. Stinnett carried Phoenix and the groceries into the apartment while the Defendant went straight inside; this was because the Defendant was "on no trespassing" orders for the apartment complex. B.S. was still in bed when they returned from the grocery, and Ms. Stinnett did not see her again that night. Ms. Stinnett went to bed while Mr. Stinnett and the Defendant stayed awake.

Ms. Stinnett testified that on Tuesday, April 5, 2011, she awoke and got Phoenix ready to leave the house while the Defendant got B.S. ready to leave. Ms. Stinnett was due in court that morning, and she remained at the courthouse until about noon, after which the Defendant's sister, Linda, and her child arrived to pick up Ms. Stinnett, the Defendant, B.S., and Phoenix. The group went to Walmart at approximately 2:30 p.m and then returned to the apartment. The Walmart security video was played for the jury. Ms. Stinnett identified in the video herself, the Defendant, the Defendant's sister and her child, B.S., and Phoenix. Ms. Stinnett stated that B.S. was sitting in the shopping cart and being active, "looking around" and raising her arms. Ms. Stinnett recalled that she noticed bruises on B.S.'s face and head while they were at Walmart. After they arrived back at the apartment, the Defendant put B.S. to bed while Ms. Stinnett took care of Phoenix.

6

Sometime later, Ms. Stinnett left the apartment to go to Kroger, Dollar General, and Western Union. When she returned, Mr. Stinnett was standing outside the apartment on the phone saying, "the baby's not breathing." When Ms. Stinnett went inside the apartment she found the Defendant walking out of Ms. Stinnett's and his bedroom with B.S. in his arms. B.S. looked "limp," and Ms. Stinnett took her from the Defendant and undressed B.S. Ms. Stinnett called her mom and then went outside with B.S. and told the apartment complex security guard she needed help. The security guard told her to go back inside her apartment, and Ms. Stinnett took B.S. back inside and lay on the couch with her until the ambulance arrived. Ms. Stinnett stated that before she could notify the security guard of her need for help, the Defendant left the apartment to avoid detection since he was not allowed on the premises.

Ms. Stinnett said that ambulance technicians would not let her ride in the ambulance, so she rode with her mom and Phoenix to the hospital. At the hospital, Ms. Stinnett was not allowed to see B.S., and doctors also examined Phoenix. Detectives asked Ms. Stinnett for permission to search her house, which she granted them, and then she spoke with the detectives. Ms. Stinnett agreed that she did not tell them the truth about what happened at first. She later gave another statement to detectives.

While at the hospital, Ms. Stinnett sent text messages to Mr. Stinnett about a safe in her apartment that she thought might contain a gun. She denied that there were drugs in the house but said that she, the Defendant, and Mr. Stinnett sometimes snorted Suboxone and got high from it.

About B.S.'s care, Ms. Stinnett testified that the Defendant was the one who usually fed, clothed, dressed, and put B.S. to sleep. Ms. Stinnett agreed that she was not involved with B.S.'s care and that she let the Defendant take care of B.S. because Ms. Stinnett did not think he would harm the baby. She said that Mr. Stinnett would take care of B.S. for short periods of time but that the Defendant spent the most time with B.S.

Ms. Stinnett stated that she lied to the police because she was scared and did not want the Defendant to get in trouble. Ms. Stinnett agreed that she was arrested in this case and charged with aggravated child neglect.

On cross-examination, Ms. Stinnett agreed that she told the police that B.S. liked to climb on things in her room and that Ms. Stinnett was afraid she would hurt herself. She stated that the Defendant kept her from having contact with B.S. and told Ms. Stinnett he would kill her and her family if they left him.

Ms. Stinnett agreed that she told the police that she bathed B.S. on Friday, April 1 and that she saw bruises on B.S.'s head at that time. She explained that she told the police this because B.S. had fallen out of her crib. She agreed that she told the police she

7

had seen B.S. jumping on the bed and fall off and that she had denied that the Defendant had hurt B.S. She agreed that she told the police that she sometimes bathed B.S. Ms. Stinnett testified that she had in fact seen B.S. fall out of her crib at the apartment and her baby bed at Ms. Stinnett's mom's house. She agreed that she had told the police that the Defendant used these incidents as excuses as to why B.S. had bruises, but she agreed that they were not "really excuses" because she had seen them happen. Ms. Stinnett also agreed that B.S. bruised easily.

Ms. Stinnett agreed that B.S. had gotten bruises when Ms. Stinnett bathed her from falling over in the bathtub. She agreed that B.S. often climbed out of her crib or play pen and that there were many items in her room next to her crib that she could have fallen on. Ms. Stinnett recalled that, when the Defendant came out of the bedroom holding B.S. in his arms, he was crying and telling Ms. Stinnett to get B.S. to start breathing. She agreed that the Defendant had never been violent with her or her children.

On redirect-examination, Ms. Stinnett denied ever hitting B.S. She stated that, while Mr. Stinnett did not hit B.S., she had seen the Defendant smack B.S. on the leg and "whoop[]" her with a shoe.

Ms. Stinnett recalled that, when she returned to the apartment on April 5, 2011, B.S. had bruises on her forehead and face and was not breathing. Ms. Stinnett stated that B.S. bruised easily but that the bruises found on her body at the time of her death were not from the "normal play" of a toddler, such as falling down or getting her legs stuck in between the bars on her crib. She reiterated that the Defendant spent "a lot" of time alone with B.S.

On recross-examination, Ms. Stinnett agreed that she slept a lot and was asleep most of the time when the Defendant was with B.S., and thus, had no knowledge of who was taking care of B.S. aside from the Defendant.

Michael Stinnett testified that in April 2011, he lived in an apartment with Ms. Stinnett, the Defendant, B.S., and Phoenix. Mr. Stinnett stated that he was the Defendant's cousin; he testified that he was not related to Brittany Stinnett. Mr. Stinnett testified that B.S. was not the Defendant's daughter. He stated that B.S. was the daughter of Ms. Stinnett and Norris Monholland, Mr. Stinnett's other cousin. He stated that the Defendant and Mr. Monholland were also cousins. Mr. Stinnett stated that a usual day in the apartment for him involved him sleeping on the couch, watching television, and playing video games. He explained that he slept "every chance [he] got" because his wife was living in a halfway house and he was passing the time while they were apart. Mr. Stinnett testified that the Defendant's usual day was similar to his: playing video games, watching television, and sleeping a lot. He testified that the Defendant also fed

8

B.S., played with her, and bathed her. During this time, Ms. Stinnett was usually in her bedroom "all day," and Mr. Stinnett "hardly ever" saw her.

Mr. Stinnett testified that he had "never" seen Ms. Stinnett feed B.S. He reiterated that B.S. was not the Defendant's child but that the Defendant was involved in raising B.S. because he wanted to be her "father figure." Mr. Stinnett testified that Ms. Stinnett was the main caretaker for Phoenix, who was a very young baby at the time, and the Defendant was the main caretaker for B.S.

Mr. Stinnett testified that the Defendant put B.S. in the bedroom most of the time, to "break the mother/daughter bond" because when B.S. was around Ms. Stinnett, B.S. would became "irate, throwing fits, screaming, crying[.]" The Defendant wanted them separate so B.S. would not be dependent on Ms. Stinnett. Around Ms. Stinnett, B.S acted like "a normal baby" but around the Defendant, B.S. was "very quiet. Did not move. [She was] scared."

Mr. Stinnett recalled that there were rules about not hugging B.S. or playing with her when the Defendant was around. B.S. was "always in trouble" or "grounded." He described the Defendant as "the man of the house" and in charge of everyone. Mr. Stinnett and Ms. Stinnett both did whatever the Defendant asked them to do and did not argue with him to "avoid confrontation" with the Defendant.

Mr. Stinnett testified that the Defendant was "strict" with B.S. and "sometimes mean" but that he was not abusive. Mr. Stinnett had never seen anyone hit B.S, but he had heard the Defendant hit her. He described what he heard:

[The Defendant] would put [B.S.] down to sleep, ten, [twenty] minutes after she was in there she would start crying, wouldn't go to sleep, so [the Defendant] would wake up and go in there and spank her and lay her back down. And sometimes this went on for hours [] a night.

And sometimes when he would be in the bedroom playing with her she would do something she wasn't supposed to do and [the Defendant] would whip her for that as well.

Mr. Stinnett stated that if B.S. would cry or play with something she was not supposed to play with the Defendant would "whip" her.

Mr. Stinnett testified that all three adults in the house used Suboxone. He stated that Suboxone caused him and Ms. Stinnett to sleep a lot but that the drug had the opposite effect on the Defendant, who would not sleep but stay awake all night.

9

Mr. Stinnett agreed that he wrote a timeline of the events from Sunday, April 3 to Wednesday April 6, 2011. He stated that Sunday was a "normal day," meaning he played video games and watched television with the Defendant, talked to his wife on the phone, and slept. Sunday night, the Defendant gave B.S. a bath, and, when it was over, he yelled to Mr. Stinnett and Ms. Stinnett that B.S. had thrown up. Mr. Stinnett slept on and off Sunday night, and woke up at around 2:00 a.m. and found the Defendant and B.S. watching videos on the computer. The Defendant was trying to put B.S. to sleep in her bedroom, and at one point, the Defendant went into the bedroom and told Mr. Stinnett to come look at B.S. Mr. Stinnett found B.S. "hanging on the outside of the crib," meaning "she had her arms in between the bars gripping the bars of the crib with her legs" and her legs were "thigh high [] through the bars." The Defendant said, "look, I told you she was getting out of the crib." B.S. was hanging on the outside of the crib and acting "scared, frightened. Trying not to fall." The Defendant then took her out of the bedroom.

Mr. Stinnett could not remember if he had ingested Suboxone that night, but he stated that the Defendant had ingested it and had been awake since Saturday. Mr. Stinnett described the Defendant's physical reaction to Suboxone: "[The Defendant] would be irate at times, full of adrenaline, full of energy, constant sweat, his eyes would get extremely wide, all he wanted to do was talk, clean, play the PlayStation. He always had to do something."

On Monday, April 4, when Mr. Stinnett woke up, Ms. Stinnett had already left for work. During that day, Mr. Stinnett, the Defendant, B.S., and Phoenix were present in the apartment. B.S. was in her bedroom all day, and the Defendant went back and forth to check on her. Mr. Stinnett did not see B.S. at all on Monday. Mr. Stinnett testified that, when Ms. Stinnett got home, she walked to B.S.'s bedroom and then asked the Defendant what was wrong with B.S.'s face. The Defendant told Ms. Stinnett that B.S. had fallen out of her crib nine times. Mr. Stinnett also noticed bruises on B.S.'s face. The Defendant and Ms. Stinnett went to the grocery store, and Mr. Stinnett stayed at the apartment with B.S. B.S. was asleep because, according to the Defendant, she did not feel well.

Mr. Stinnett testified that B.S. came out of her bedroom while he was alone with her in the apartment and that she had bruises "on her face, forehead, below the eyes." Mr. Stinnett put B.S. on the kitchen counter and took pictures of her bruises on his cell phone, which he later gave to the police. Mr. Stinnett identified the photographs he had taken depicting bruises on the left and right side of B.S.'s face, above and below her eyes. Mr. Stinnett testified that there were also bruises on her temple and nose. He stated that her face was "covered with bruises." After taking the pictures, Mr. Stinnett gave B.S. a doughnut and put her on the couch. Soon after, the Defendant walked into the apartment and asked Mr. Stinnett to help Ms. Stinnett bring groceries into the house, which Mr.

10

Stinnett did. He did not show the pictures to the Defendant or Ms. Stinnett. The Defendant put B.S. back in her bed, saying she was "sick and sleepy."

Mr. Stinnett woke up on Tuesday, April 5, and took his wife, Danielle Stinnett, to a meeting with her probation officer. He then returned to the apartment and was there alone until about 1:00 p.m. when the Defendant and Ms. Stinnett returned with B.S. and Phoenix. Mr. Stinnett's wife came over to the apartment as well. B.S. remained in her bedroom throughout the entire day. Ms. Stinnett then left the apartment, and, while she was gone, the Defendant brought B.S. out of her room and said that B.S. was "acting weird" and that he needed help. Mr. Stinnett stated that B.S. "couldn't catch her breath," so he decided to call the police. The Defendant did not want him to call the police because there was an outstanding warrant for the Defendant's arrest, but Mr. Stinnett called anyway. The ambulance arrived and transported B.S. Mr. Stinnett did not see the Defendant again.

Mr. Stinnett recalled that on Tuesday night, April 5, when the Defendant brought B.S. out of her room, she was "pale." Mr. Stinnett tried to revive B.S. and, when he could not, he called the police "within two minutes."

Mr. Stinnett later gave a statement to police, during which he did not tell them that the Defendant was with B.S. that night. He instead told them that the Defendant's sister was with him in the apartment. Mr. Stinnett did this because he was afraid of what the Defendant would do to him if the Defendant were arrested. The Defendant "made it clear" to Mr. Stinnett that he was not to tell anyone that the Defendant was at the apartment. Mr. Stinnett agreed that he gave two statements to the police.

Mr. Stinnett testified that his cousin, Mr. Monholland, slept with Mr. Stinnett's wife and got her pregnant. Mr. Stinnett stated that, from the moment he saw B.S., he knew she was Mr. Monholland's baby. Mr. Stinnett stated that he had bad feelings towards Mr. Monholland during April of 2011, because he had impregnated Mr. Stinnett's wife, but Mr. Stinnett denied that he took his anger towards Mr. Monholland out on B.S. Mr. Stinnett denied beating B.S. or participating in her care in any manner.

Mr. Stinnett recalled that on Sunday, April 3, B.S. did not have bruises on her face.

On cross-examination, Mr. Stinnett agreed that he had lied to the police when he told them that he worked sixty hours per week at the time B.S. died. He agreed that he told police he did not live at the apartment. He stated that the Defendant had not been violent towards Ms. Stinnett. Mr. Stinnett agreed that he had lied throughout the investigation of this case. He stated that he felt threatened by the Defendant and was afraid of him but stayed at the apartment because he did not have anywhere else to sleep.

11

Mr. Stinnett stated that the Defendant would sometimes punish B.S. by spanking her when she put her fingers in electrical outlets. He agreed that this was because it was a safety issue. Mr. Stinnett testified that B.S. did not sleep exclusively in her crib and that the instances when she slept somewhere else "were all within the week that this situation happened." He agreed that he and the Defendant were the only people present in the apartment when B.S. was dying. He however reiterated that he did not see B.S. one time that day, while the Defendant was in and out of B.S.'s bedroom, checking on her and playing with her. Mr. Stinnett agreed that B.S. was walking and seemed fine when the group returned from Walmart on Tuesday, April 5.

Mr. Stinnett agreed that he told the police that he thought the Defendant's motive for abusing B.S. was because "he doesn't like her daddy," Mr. Monholland. Mr. Stinnett agreed that his wife was having an affair at some point with Mr. Monholland and that she got pregnant by him and later had an abortion. He agreed that this made him upset with Mr. Monholland. Mr. Stinnett also agreed that he was a suspect in B.S.'s death because he was the only other person in the apartment besides the Defendant that day. Mr. Stinnett reiterated that his anger towards Mr. Monholland about the affair would not have caused him to harm B.S.

On redirect-examination, Mr. Stinnett confirmed that the Defendant was alone with B.S. on Tuesday, April 5. He agreed that the Defendant was "raising" B.S. He stated that, if B.S. was screaming or crying, he did not feel free to intervene and that the Defendant always went to her. Mr. Stinnett said: "I couldn't even talk to [B.S.] without [the Defendant] telling me, don't talk to her, she's grounded. Don't look at her. She'd wave at me, he'd smack her hands down. You're grounded." Mr. Stinnett said he thought the way the Defendant was raising B.S. was "a little harsh at times" but, otherwise, he felt that the situation was normal.

Krista Sheppard testified that she worked at the Knoxville Police Department as an investigator in the major crimes unit. Investigator Sheppard recalled that she responded to the University of Tennessee Hospital on April 5, 2011, where she saw B.S. She described B.S., who was on a stretcher, as having "a lot of bruising" and tubes coming out of her nose. Investigator Sheppard spoke with Investigator Tonkin, who had interviewed Ms. Stinnett, and he reported that Ms. Stinnett said that someone else was taking care of B.S. when B.S. fell out of her crib. Investigator Sheppard observed further conversation between Ms. Stinnett and Investigator Tonkin, during which Ms. Stinnett said that a "family friend," Mr. Stinnett, was taking care of B.S. when she had fallen out of her crib.

Investigator Sheppard then attempted to create a timeline of "who had seen [B.S.] without bruises." She said that the bruising on B.S.'s face was not "all fresh."

12

Investigator Sheppard learned that Ms. Stinnett had a boyfriend, the Defendant, who had also been at the apartment that day. Investigator Sheppard transported Ms. Stinnett to the police department to interview her further. In the interview, Ms. Stinnett told Investigator Sheppard that Norris Monholland was B.S.'s father, but he had only seen B.S. once. During that interview, Ms. Stinnett described a timeline of events that occurred the weekend prior to B.S.'s death, beginning with Friday, April 1. Ms. Stinnett told Investigator Sheppard that on Friday B.S. was "fine" but that she had noticed B.S. had some bruises on her head and on the inside of her knees. She stated that the Defendant told her that B.S. had fallen out of her crib on Friday while Ms. Stinnett was at the store. Ms. Stinnett told the investigator that she was "terrified" of the Defendant. Ms. Stinnett recalled that, two months prior, B.S. had a bruise on her back, and the Defendant told Ms. Stinnett that B.S. had crawled underneath her crib and hit her back. Ms. Stinnett said that she and the Defendant took care of B.S., and sometimes Ms. Stinnett's mother would take B.S. to her house. Ms. Stinnett recalled that B.S. had fallen off of Ms. Stinnett's bed and bruised her ribs and that B.S. had also fallen in the bathtub and bruised her bottom. She stated that the Department of Children's Services had opened a case because of the bruise on B.S.'s bottom, but nothing resulted from the investigation. Ms. Stinnett stated that B.S. "climb[ed] on everything" and "g[ot] little bruises." Ms. Stinnett speculated that B.S. could have hit her head on the floor when she fell out of her crib. The Defendant told Ms. Stinnett that, when B.S. fell out of her crib, she also cut her forehead.

Ms. Stinnett told Investigator Sheppard that B.S. slept sixteen hours on Friday night and seemed normal when she woke up on Saturday. Ms. Stinnett's mom took care of B.S. on Saturday afternoon. On Sunday morning, B.S. seemed "fine," and Ms. Stinnett, her mother, B.S., and Phoenix went to church together. Later on Sunday, Ms. Stinnett fed B.S. and gave her a bath. Ms. Stinnett worked all day the next day, Monday, while the Defendant took care of B.S., and, on Monday night, she went to Kroger with the Defendant while B.S. stayed home with Mr. Stinnett. On Tuesday, Ms. Stinnett woke up and she, the Defendant, B.S., and Phoenix all went to court. They then went to Walmart with the Defendant's sister and her daughter. Ms. Stinnett described B.S. as "fine" while they were shopping at Walmart. The group then returned home. Based on Ms. Stinnett's timeline, Investigator Sheppard obtained evidence to confirm Ms. Stinnett's account, such as receipts and video recordings, from the locations where Ms. Stinnett had been with B.S. Ms. Stinnett stated that it was later Tuesday night that, after she returned from the store, she found Mr. Stinnett outside the apartment saying, "your baby's not breathing."

Investigator Sheppard stated that, at some point, the Defendant was taken into custody on an arrest warrant, and she interviewed him on April 6, 2011. The recorded interview was played for the jury. In the interview, the Defendant stated that he had been living in the apartment for approximately four months. He stated that he slept in a room

with Ms. Stinnett and Phoenix and that B.S. slept in her own room. He stated that he had noticed "real bad" bruises on B.S.'s face and legs, as well as a carpet burn on her face and that both her lips were "busted." He stated that, when Ms. Stinnett got home "that night," April 4, 2011, she asked the Defendant why B.S. had bruises on her. He and Mr. Stinnett told Ms. Stinnett that B.S. had fallen out of her crib because "that's the only explanation we had." He observed the same bruises and marks when he had given B.S. a bath that day, and he thought that it looked like B.S. had been beaten.

In the interview, the Defendant stated that Ms. Stinnett had a job, and, since the Defendant did not have one, he took care of B.S. He said that B.S. got little bruises all over her from where she would play and fall down. The Defendant said that Ms. Stinnett started her job, and she left the apartment at around 6:10 a.m. on April 5. After she left, the Defendant went back to sleep, and Mr. Stinnett, B.S., and Phoenix all remained asleep. Throughout the day, the Defendant would wake up when either Phoenix or B.S. needed to be fed or played with and then he would lay down with them or let them play. When Ms. Stinnett returned home from work that evening, she and the Defendant went to Walmart with Phoenix, leaving B.S. at the apartment with Mr. Stinnett. Later that evening, Ms. Stinnett went out to get some food, and the Defendant went to B.S.'s room to check on her. The Defendant described walking into B.S.'s room and finding her:

> When I went to wake [B.S.] up, I laid her in our bedroom floor, went to get the wipes. When I came in there is when she was curled up in a ball moaning. I picked her up. . . . She wasn't responding to me, which I thought she was having a seizure because [Ms. Stinnett] has them.

The Defendant denied being abusive towards B.S. or having any knowledge about how she sustained her injuries, other than falling out of her crib.

Investigator Sheppard testified that the crime lab unit was sent to the apartment with instructions to measure the distance from the top of the crib to the floor and the top of the bed to the floor. The unit was also instructed to pull up the carpet on the floor to confirm that there was padding underneath and to measure the depth of the carpet and the padding. Investigator Sheppard then took Ms. Stinnett back to the apartment, and they walked through it together. Mr. Stinnett and his wife were present at the apartment. Another investigator accompanied them to the apartment, and he interviewed Mr. Stinnett in his police vehicle. During the walk through of the apartment, Ms. Stinnett showed Investigator Sheppard where the occupants slept and showed her where B.S. had fallen out of her crib. Investigator Sheppard observed toys in B.S.'s room. She collected into evidence the crib, the crib mattress, the "stick," the bedding, and the receipts. Investigator Sheppard collected the stick because it was "out of place." Investigator

14

Sheppard testified that Ms. Stinnett acted nonchalant, at times giggling, throughout their visit to the apartment.

Investigator Sheppard went back to the hospital when doctors removed B.S. from life support, and the investigator requested an autopsy, which took place the next day.

On cross-examination, Investigator Sheppard agreed that there were multiple toys found in B.S.'s bedroom but that she only collected one to place into evidence. She stated that the Defendant told her that B.S.'s crib was broken because she had been climbing out of it. Investigator Sheppard reiterated that she spoke with Ms. Stinnett several times during the investigation and that, at times Ms. Stinnett exhibited inappropriate behavior in light of the situation, such as laughing and giggling. She stated that both Ms. Stinnett and Mr. Stinnett had lied to her during the investigation and that the various statements given at various times by Mr. Stinnett and Ms. Stinnett were "inconsistent." She agreed that both Mr. Stinnett and the Defendant told her that B.S. was not eating in the days leading up to her death. She agreed that Mr. Stinnett and his wife both offered a possible motive for the Defendant to hurt B.S. Investigator Sheppard was "advised" that both Mr. Stinnett and the Defendant were "upset" with Mr. Munholland.

Dr. Darinka Mileusnic-Polchan, the Knox County Chief Medical Examiner, testified as an expert witness in the fields of forensic pathology, anatomic pathology, and clinical pathology. She stated that she had performed the autopsy on B.S.'s body on April 11, 2011.

Dr. Mileusnic-Polchan's autopsy report was entered as evidence into the record. She identified photographs of B.S.'s injuries, taken at the hospital and during the autopsy, and gave the following description of B.S.'s injuries depicted in the photographs:

> Th[ese are] some of the photographs taken before the internal examination started. And the lesion or healing scab that we saw on [B.S.'s] forehead in the hospital is still there. Again, there are a couple of other contusions that are visible now in [B.S.'s] hairline of the right temple.
>
> Again, the size of these contusions [on B.S.'s head] vary from like one inch on the right temple that goes into the hairline to the series of contusions that actually spread from [B.S.'s] eye toward [her] ear. [The contusions] varied in size from .4 to .5 inch, half an inch. There was also another set of series of contusions that ran from the level of the ear toward the chin. And then there was also another contusion right here [] close to the core of the mouth.

15

A healing scab that was not visible before in [B.S.'s] eyebrow. . . .

There were also a couple of contusions on the nose. As I said, the size varied. The distribution [of the contusions] was very telling of characteristics, because these are all contusions that the number and distribution are inconsistent with any kind of child play. Obviously this is child abuse.

Dr. Mileusnic-Polchan was shown more photographs of B.S.'s body, taken during the autopsy, and she described for the jury what was depicted, including the areas of contusions and lesions all over B.S.'s body. Dr. Mileusnic-Polchan testified that, while children can get contusions from child's play, B.S.'s contusions and lesions "were not characteristic distribution for child play," based on their "pattern," that she compared to a set of train tracks. Dr. Mileusnic-Polchan testified that the contusions founds on B.S.'s torso were "very unusual" for child's play. Dr. Mileusnic-Polchan identified injuries to B.S.'s head, which she described as "quite deep." She testified that she counted fifty-one total injuries on B.S.'s body and said that many were in a pattern formation inflicted by something that would "leave imprints – the knuckles maybe from the back of the hand."

Dr. Mileusnic-Polchan testified that the color of B.S.'s bruises allowed for her to estimate the age of the bruises. She stated that the areas of injuries with "acute hemorrhage" had been inflicted just prior to B.S.'s hospitalization and that some other areas of injuries were a couple of weeks or a month old. Dr. Mileusnic-Polchan testified that she pulled back B.S.'s scalp, revealing a huge bruise on B.S.'s skull. She testified that B.S.'s head injuries were blunt force injuries, due to a "hard slap," a punch, or grabbing her ear and twisting it.

Dr. Mileusnic-Polchan testified about her autopsy report, beginning with a "general description of [B.S.'s] body . . . ." She stated:

One thing that was concerning right away was that the height of this child was about 32 inches which placed her within the 50th percentile. And the weight was about 20 pounds which was actually a little below the third percentile, that was very concerning. And one of the things that we always do [is] request the medical records [from the child's previous doctor or hospital visits.] . . . [L]ooking at the history [of B.S] was very concerning that from birth until about 15 months this child was progressing really beautifully and growing and following the charts around the 50th percentile or above and then it was a sudden drop. So between the age of 15 months and 19 months something happened to cause the sudden drops, that's what the autopsy also confirmed.

16

Dr. Mileusnic-Polchan went on to review the list of injuries on B.S.'s body as follows:

> In the blunt force injuries [to B.S.'s] head I listed them from number one to number 26. I started with the top of the head, the contusion that I described, and then on the forehead there w[ere] several contusions that ranged in size from one inch to 1.2 and 1.6 inches. So that's the frontal scalp, right forehead, right forehead above the eye, left forehead. And then on [B.S.'s] nose there was also bruising on the left side, a couple of quarter inch bruises. And the tip of [B.S.'s] nose also had a bruise . . . .

Dr. Mileusnic-Polchan went on to describe the multiple injuries to B.S.'s head. She testified that her main concern was not simply the "multiplicity" of the injuries but also the extent of them. She stated that peeling away the scalp from the skull confirmed "not only the extent of these contusions [on B.S.'s] head" but "also the depth," which revealed that her injuries were "serious."

Dr. Mileusnic-Polchan testified about the injuries to B.S.'s torso, which she described as blunt force injuries. She testified that these injuries were in a similar pattern as those she found on the legs, showing that whatever came into contact with B.S.'s torso also caused the injuries to her legs. She found extensive bruising and contusions on B.S.'s rib cage, hips, buttocks, and back. She stated that the injuries to B.S.'s legs could not be explained from a child falling during normal activity. B.S's leg injuries were on the inner sides and back of the legs and that was "not where the kids get frequently injured" during play "in this sort of frequency."

Based on her list of fifty-one separate injuries on B.S.'s body, Dr. Mileusnic-Polchan testified that it was an area of argument that B.S. was hit fifty-one different times or possibly 100 times. The injuries however established with certainty, based on "the distribution and the size and the number of injuries," that they were not caused by normal childhood injury.

Dr. Mileusnic-Polchan testified about the internal examination of B.S.'s body. She stated that there was "not much" trauma in the torso area and that the primary area of trauma was B.S.'s head. As such, she focused her examination on B.S.'s head, which she described as follows:

> [F]requently there's an injury in [a] big vein or sinus and some of the veins are called bridging veins that's going to start bleeding. And that's what happened in [B.S.'s] case, there were tears in the veins and they caused the major bleeding. . . . [T]here was a thick layer of subdural hemorrhage. That's an indication of trauma. Unless there's some

17

malformation or some congenital problem with blood vessels, which [B.S.] did not have, that's trauma until proven otherwise.

Dr. Mileusnic-Polchan testified that the major trauma to B.S.'s brain had caused her to suffer a hemorrhage in the retina in both of her eyes; the hemorrhage to her left eye was "extensive" to her "entire retina." She stated that, had she lived, B.S. would have had "major problems with her vision." She testified that B.S. had two bruises on the back of her head that caused a "true deep hemorrhage" "all the way into the brain itself." Dr. Mileusnic-Polchan testified that, had B.S. survived, she would have likely been blind because "the whole area of the brain in the back of the head was destroyed with a bruise."

Dr. Mileusnic-Polchan testified that B.S.'s head injuries could not have been accidental. About the hemorrhage on the back of B.S.'s head and the bruising on the brain, she testified that those injuries could not have been sustained from falling out of a crib. She stated that falls could certainly cause head trauma and even a skull fracture but that a fall would not cause a bruise on the brain. Dr. Mileusnic-Polchan testified that the cause of B.S.'s death was likely the "blow to the back of the head that caused the bruising on the brain," however she also felt that the "cumulative" injuries caused B.S.'s death. Dr. Mileusnic-Polchan testified that she had viewed the security video from Walmart that was recorded on the day of B.S.'s death and showed B.S. moving and reaching for things. Dr. Mileusnic-Polchan stated that B.S. received the injury to her head after the Walmart video was recorded.

Dr. Mileusnic-Polchan testified that, in her opinion, B.S. was a "victim of battered child syndrome, and the manner of [her] death was homicide." She stated that B.S. died because her "brain was compressed and lacked circulation because of the injury due to the subdural hemorrhage combined with cerebral contusions which are a consequence of blunt force head injuries."

On cross-examination, Dr. Mileusnic-Polchan testified that B.S.'s injuries had not been sustained during one incident; some injuries were "underlying old contusions" and some were "fresh." She agreed that she did not visit the apartment, although that was something her office typically did. She agreed that she did not interview any of B.S.'s family members. She also agreed that, if B.S. "was held 40 inches off the floor by her feet and dropped onto her head," that could have caused her injuries.

Dr. Mileusnic-Polchan testified that she could state "for a fact" that B.S.'s injuries were not caused by an accident and that was why she categorized it as a homicide. Dr. Mileusnic-Polchan testified that B.S. was "murdered" and "badly abused," but stated that she did not know who committed the abuse.

On redirect-examination, Dr. Mileusnic-Polchan testified that B.S. suffered her brain injury on April 5, 2011.

On behalf of the Defendant, Arthur Lee Hubbard then testified that he had known the Defendant since 2001 and that he had stayed at the apartment in 2010 or in early 2011. He stated that Mr. Stinnett was also living there at the time. Mr. Hubbard stated that he observed the Defendant taking care of B.S. and Phoenix while Ms. Stinnett was at work. He testified that he had seen both the Defendant and Ms. Stinnett discipline B.S. He stated that the Defendant had a loving and caring relationship with B.S. and that he did not keep her from seeing people. Mr. Hubbard did not see anything occur that would make him think the Defendant was not a good caregiver. Mr. Hubbard described B.S. as a "little daredevil." He testified that he did not see anyone abuse her in the apartment.

On cross-examination, Mr. Hubbard agreed that he was in prison for attempted robbery and assault at the time of trial. He agreed that he was not living in the apartment in March or April of 2011. He agreed that, when he was staying in the apartment, the Defendant was B.S.'s caregiver. He stated that he was in and out of the apartment and not paying "a hundred percent" attention to B.S.

The defense recalled Investigator Sheppard, and she testified that she had contacted Arthur Lee Hubbard during the trial to ask him if he had seen anything happen in the apartment when he had lived there. She stated that Mr. Hubbard did not provide her with any information.

Based on this evidence, the jury convicted the Defendant of felony murder committed during the perpetration of aggravated child abuse and aggravated child abuse. The trial court sentenced the Defendant to life in prison for the felony murder conviction with a consecutive twenty-year sentence for the aggravated child abuse conviction. It is from these judgments that the Defendant now appeals.

## II. Analysis
### A. Motions for Mistrial

On appeal, the Defendant claims that the trial court erred when it denied several motions for mistrial made by the Defendant. We will address each motion in turn.

### 1. Mr. Stinnett's Testimony

First, the Defendant claims that the trial court should have granted a mistrial when Mr. Stinnett violated the trial court's order not to testify about the Defendant's prior criminal history. Mr. Stinnett testified that he was afraid of the Defendant because the Defendant owned guns and a mask, and the Defendant argues that this testimony was

ruled as inadmissible by the trial court and prejudiced the Defendant in the eyes of the jury. The Defendant argues that this Court "has to assume" that the State purposefully elicited the answer from Mr. Stinnett and that this "deliberate action" warrants a new trial. The State responds that Mr. Stinnett did not elaborate on his statement and made no mention of robberies or other prior crimes. The State argues there was no manifest necessity requiring a mistrial based on Mr. Stinnett's statements, and that the trial court offered to give a curative instruction to the jury, which the Defendant declined.

On direct examination, the prosecutor asked Mr. Stinnett why he lied to investigators, and he responded that he was scared. Mr. Stinnett testified that he was scared specifically of the Defendant, and, when asked why, he stated that "from what [he had] seen, [the Defendant] had guns. He had [ski] masks." Defense counsel objected at this point, and the trial court held a jury-out hearing during which the trial court acknowledged that it had granted a Motion in Limine precluding the State's witnesses from discussing the Defendant "having possessed weapons and . . . having committed aggravated burglaries." The prosecutor argued that he was trying to elicit testimony from Mr. Stinnett that he felt threatened by the Defendant. The trial court stated that it concluded that there was no manifest necessity for a mistrial but offered to give a curative instruction to the jury that they "must disregard" any of Mr. Stinnett's testimony about guns or ski masks and that they could not consider the prosecutor's question or Mr. Stinnett's answer. The Defendant declined to have a curative instruction given to the jury, arguing that it would draw more attention to the issue. The Defendant also argued that he was now forced to cross-examine Mr. Stinnett on his testimony, thus drawing the jury's attention to the issue.

The purpose of a mistrial is to correct the damage done to the judicial process when some event has occurred that would preclude an impartial verdict. *See Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). A mistrial is appropriate "when the trial cannot continue, or, if the trial does continue, a miscarriage of justice will occur." *State v. McPherson*, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). The decision of whether to grant a mistrial is within the sound discretion of the trial court. *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). Normally, a mistrial should be declared only if there is a manifest necessity for such action. *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). One description of manifest necessity is that, "[i]f it appears that some matter has occurred which would prevent an impartial verdict from being reached," a mistrial must be declared. *Id*. Additionally, a manifest necessity exists when "no feasible alternative to halting the proceedings" exists. *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. Crim. App. 1981). The burden of establishing a manifest necessity lies with the defendant. *State v. Seay*, 945 S.W.2d 755, 764 (Tenn. Crim. App. 1996). This Court will not disturb that decision unless there is an abuse of discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990); *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

In determining whether there is a "manifest necessity" for a mistrial, "'no abstract formula should be mechanically applied and all circumstances should be taken into account.'" *State v. Mounce*, 859 S.W.2d 319, 322 (Tenn. 1993) (quoting *Jones v. State,* 218 Tenn. 378, 403 S.W.2d 750, 753 (Tenn. 1966)). Although Tennessee courts do not apply any exacting standard for determining when a mistrial is necessary after a witness has injected improper testimony, this Court has considered: (1) whether the improper testimony resulted from questioning by the State, rather than having been a gratuitous declaration; (2) the relative strength or weakness of the State's proof; and (3) whether the trial court promptly gave a curative instruction.[2] *See State v. Demetrius Holmes,* No. E2000-02263-CCA-R3-CD, 2001 WL 1538517, at *1-4 (Tenn. Crim. App., at Knoxville, Nov. 30, 2001); *State v. William Dotson*, No. 03C01-9803-CC-00105, 1999 WL 357327, at *4 (Tenn. Crim. App., at Knoxville, June 4, 1999).

In light of the list of non-exclusive factors, we conclude that the factors weigh in favor of the trial court's denial of a mistrial. There is nothing in the record that supports the Defendant's argument that the State intentionally elicited this testimony from Mr. Stinnett. The State contended during the jury-out that it was simply trying to elicit Mr. Stinnett's testimony that he felt threatened by the Defendant and stated that it had specifically admonished Mr. Stinnett not to testify to anything related to prior robberies or gang involvement. The trial court offered to give a curative instruction to the jury, which the Defendant declined. Further, the State produced ample evidence to sustain a conviction against the Defendant. Accordingly, we conclude that the trial court did not abuse its discretion when it declined to declare a mistrial at this point in the proceedings. The Defendant is not entitled to relief on this issue.

## 2. Brady Violations

The Defendant next claims that the trial court should have granted a mistrial on the basis that the State failed to turn over *Brady* material, specifically that Mr. Stinnett knew that B.S.'s father had had an affair with Mr. Stinnett's wife that resulted in pregnancy and an abortion, giving Mr. Stinnett the motive to hurt B.S. The Defendant also claims that Investigator Sheppard interviewed Mr. Hubbard during the trial and did not make the information she elicited from him available to the Defendant. The State first responds that the identity of the father of Mr. Stinnett's wife's baby was not *Brady* material because the State was "not in exclusive control" of the information. The State further responds that it had no knowledge of the identity of the father of this baby. Finally, the State responds that Investigator Sheppard learned nothing from Mr. Hubbard when she

---

[2] These factors are non-exclusive and may not be pertinent in every case. *Dotson,* 1999 WL 357327, at *4; *see Mounce,* 859 S.W.2d at 322 (holding that determination of propriety of mistrial is not subject to mechanistic determination and should be made on the facts of each individual case).

interviewed him during trial. As such, the State claims that the Defendant has failed to show that the trial court should have granted a mistrial on these grounds.

In *Brady v. Maryland,* 373 U.S. 83, 87 (1963)*,* the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." In order to establish a due process violation under *Brady*, four prerequisites must be met:

1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information, whether requested or not);

2. The State must have suppressed the information;

3. The information must have been favorable to the accused; and

4. The information must have been material.

*State v. Edgin,* 902 S.W.2d 387, 389 (Tenn. 1995). The burden of proving a *Brady* violation rests with the defendant, and the violation must be proven by a preponderance of the evidence. *Edgin,* 902 S.W.2d at 389.

The Defendant moved for a mistrial, claiming that the State had withheld evidence about the identity of the father of Mr. Stinnett's wife's child. The State argued that it had no knowledge of who the father was and that it only knew that Mr. Stinnett's wife had had an affair. The State said "there was no mention of who she got pregnant by" and acknowledged that "[l]ots of people in this case got pregnant by lots of different people." The State argued that it had "no indication of who it was or any relation to this case" when Mr. Stinnett and his wife gave their statements. The trial court denied the Defendant's motion for mistrial on the basis that there was no manifest necessity for a mistrial based on this allegedly withheld information.

We have reviewed the evidence in question, and we conclude that no *Brady* violation was committed by the State. There is no evidence that the State had the information about the identity of the baby's father or that the State suppressed the information. On the contrary, the State argued that it did not know the identity, and the trial court acknowledged that the information was unclear about who the father of the baby was. As such, the Defendant has not established by a preponderance of the evidence that a *Brady* violation was committed. The Defendant is not entitled to relief.

22

As to the Defendant's motion relative to the information provided by Mr. Hubbard, he risks waiver by failing to make an argument in his brief specific to this issue. Even so, based on the testimony of Investigator Sheppard and Mr. Hubbard, there is no evidence that any information favorable to the Defendant was provided by Mr. Hubbard. In fact, the testimony at trial was that Mr. Hubbard provided no information, and he did not reside at the apartment at the time of these events. The Defendant has failed to establish that he was entitled to a mistrial, and he is not entitled to relief on this issue.

## B. Sufficiency of the Evidence

The Defendant challenges the sufficiency of the evidence to sustain his conviction for aggravated child abuse. Specifically, he claims that there was insufficient evidence to show: (1) that he inflicted the injuries on B.S.; and (2) that a crime was committed. The State responds that the evidence was sufficient for a jury to find that the Defendant committed aggravated child abuse. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted).

"The standard of review [for sufficiency of the evidence] is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial

judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S .W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

Aggravated child abuse occurs when the accused knowingly, other than by accidental means, treats a child under the age of eighteen in such a manner as to inflict injury and the act of abuse results in serious bodily injury to the child. T.C.A. § 39-15-401(a)(2014); § 39-15-402(a)(1) (2014). Felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, or aircraft piracy." T.C.A. § 39-13-202(a)(2) (2014).

The evidence, considered in the light most favorable to the State, showed that B.S.'s death was caused by child abuse. B.S. sustained a total of fifty-one injuries to her body, most severely a hemorrhage in her brain caused by blunt force trauma. B.S. suffered "repeated blows of great force," and the "whole area" of her brain on the back of her head was "destroyed" by a bruise. In that area, B.S. suffered a subdural hemorrhage, which indicated blunt force trauma. The medical examiner concluded with certainty that, based on "the distribution and the size and the number of injuries," B.S.'s injuries were not caused by normal childhood injury and were not accidental. Dr. Palmer testified that there was "no accidental mechanism" that she could conceive of "that would explain [B.S.'s injuries] even in some minority much less the totality." Finally, the medical examiner testified that, in her expert opinion, B.S. was a "victim of battered child syndrome and the manner of [her] death was homicide." This evidence is sufficient from

which the jury could conclude B.S. suffered serious bodily injury by means that were not accidental and that B.S. died as a result of her injuries. As such, the evidence is sufficient to support convictions for aggravated child abuse and felony murder in the perpetration of aggravated child abuse.

As to the Defendant's argument that he did not injure and kill B.S., the evidence presented was that he was B.S.'s primary caregiver, which included clothing, feeding, changing her diaper, and putting her to bed on a daily basis. The Defendant, Mr. Stinnett, and Ms. Stinnett all stated to investigators or testified that the Defendant was the primary caregiver. The decline in B.S.'s development, according to the medical examiner, began four months prior to her death, the time the Defendant stated that he had moved into the apartment. The medical examiner said that the injury to B.S.'s head, which led to her subdural hemorrhage, occurred in the hours after she went to Walmart. During this time, and in the hours leading up to B.S.'s hospitalization, the Defendant was the person taking care of B.S. and checking on her while she was in her bedroom. This is sufficient evidence for a jury to conclude that the Defendant was guilty of aggravated child abuse. Accordingly, the evidence was sufficient to support the jury's finding beyond a reasonable doubt that the Defendant committed aggravated child abuse and felony murder in the perpetration of aggravated child abuse.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE

25